UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
DEBRA MERCADO,

                         Plaintiff,                                    16-cv-6087 (PKC)

          -against-                                                  MEMORANDUM
                                                                     AND ORDER

NANCY A. BERRYHILL, ACTING
COMMISSIONER OF SOCIAL SECURITY,

                         Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.


          Plaintiff Debra Mercado seeks judicial review under 42 U.S.C § 405(g) of the

final decision of the Commissioner of Social Security (the "Commissioner"), who concluded that

she is not eligible for Disability Insurance Benefits ("DIB") under Title II of the Social Security

Act (the "Act"), 42 U.S.C. § 401 *et seq.*  Plaintiff asserts that the determination of an

Administrative Law Judge ("ALJ") that she is not disabled within the meaning of the Act was

erroneous, not supported by substantial evidence, and contrary to law.  (Compl't ¶ 12).

Specifically, plaintiff argues that the ALJ (1) improperly applied the treating physician rule; (2)

failed to sufficiently develop the record; and (3) erred in his credibility assessment of plaintiff.

(Pl.Mem.12-21).


          Plaintiff and defendant have each moved for judgement on the pleadings under

Rule 12(c), Fed. R. Civ. P.  For the reasons set forth below, the plaintiff's motion is denied and

the defendant's motion is granted.

## I.     PROCEDURAL HISTORY

On August 15, 2012, plaintiff applied to the Social Security Administration ("SSA") for DIB due to a "disabling condition," alleging an onset date of July 12, 2012. (R. 181). The SSA initially denied plaintiff's claims in a letter dated December 4, 2012. (R. 111-115). On January 21, 2013, plaintiff made a timely request for a *de novo* hearing before an ALJ, which was held through video conference on November 22, 2013. (R. 118, 49). Plaintiff appeared at the hearing and was represented by counsel. (R. 51). At the hearing, plaintiff testified about her age, educational background, work history, daily activities, and physical condition. (R. 49-109). Additionally, a vocational expert appeared and testified at the hearing. (*Id.*).

In a written decision dated September 4, 2014, the ALJ denied plaintiff's claim for benefits. (R. 22-40). Applying the agency's sequential five-step test for determining whether an individual is disabled, the ALJ concluded that plaintiff was not disabled under Sections 216(i) and 223(d) of the Social Security Act. (R. 27-8). Based on the evidentiary record, he concluded that although plaintiff has several severe impairments, including "obesity, left knee derangement status post arthroscopy, right knee internal derangement status post right and left Achilles tendon repairs, bilateral plantar fasciitis, lumbar spine disc herniations and bulges with radiculopathy, cervical spine disc bulges and minimal disc herniations, mild carpal tunnel syndrome, and left hip bursitis," plaintiff did not have an "impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (*Id.*). The ALJ concluded that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), "except that she must ambulate with a cane, she can occasionally stoop, crouch, kneel, and climb and descend stairs; frequently

flex, extent, and rotate the neck; frequently finger bilaterally; and she needs to be able to sit and stand at will." (R. 28).

On October 29, 2014, plaintiff requested review of the ALJ's decision. (R. 10-21). The SSA Appeals Council denied plaintiff's request for review on June 9, 2016, adopting the ALJ's decision as the final decision of the Commissioner of Social Security. (R. 1-3).

Plaintiff filed a timely action in this Court seeking review of the Commissioner's final decision. Both parties moved for judgement on the pleadings pursuant to Rule 12(c), Fed. R. Civ. P.

## II. EVIDENCE BEFORE THE ALJ

The evidence before the ALJ consisted of the testimony of the witnesses, medical records, evaluations, and reports. The record is summarized below.

### A. *Non-Medical Evidence*

#### 1. *Plaintiff's Testimony and Functional Report*

On July 12, 2012, the alleged onset date of disability, Debra Mercado was a married, 52 year old college graduate with three children aged 17, 15 and 13. (R. 66-72). Prior to her most recent occupation, plaintiff worked in public relations in the music industry, supervising 200 people and earning $48,500 per year. (R. 206, 226). She reported that this work did not require lifting, carrying, stooping, kneeling, crouching or the handling of big objects. (R. 226). She explained that on an average day, her job required her to perform 2.5 hours of each of the following activities: walking, standing, sitting, writing, typing and handling small objects. (*Id.*).

After that, plaintiff worked as an Assistant Manager at Walmart from September 2008 until the alleged onset date of disability.  As an Assistant Manager, she was paid $50,000 per year to, *inter alia*, maintain inventory levels, budget, forecast sales, and assess economic trends.  (R. 206, 225).  She also supervised 150-200 people.  (R. 225).

Her job responsibilities also included lifting objects up to 25 pounds, stocking shelves, pulling crates, and pushing carts.  (R. 69).  After a surgery in December 2011 on her right foot, (R. 231), she returned to work in February 2012 until July 12, 2012, when it became too painful to work.  (R. 221).

Plaintiff testified that since July 12, 2012, she has experienced pain that radiates from her lower back, down through her leg and left foot.  (R. 92).  She also experiences pain in her neck, hip and shoulder, and testified that she consistently experiences this pain at an 8 out of 10 intensity.  (R. 74-5).  She is prescribed Lyrica, oxycodone, and diclofenac for the pain, but she testified that the medications are barely effective and sometimes make her ill.  (R. 73).  She was involved in a car accident in January of 2013, the effects of which, she testified, have only exacerbated her pain.  (R. 107-8).

She has undergone multiple foot, back, and knee surgeries from June 2010 to July 2013.  (R. 66).  Additionally, she received multiple back, knee and neck injections during that time period, but noted that those procedures were not effective at reducing her pain.  (R. 76).

Her pain, according to her testimony, precludes her from 10 to 15 minutes of continuous walking, sitting, or standing.  (R. 85-86).  She reports that she has been using a cane for "months" and now uses it all the time.  (R. 87).

Plaintiff testified that her life has changed "dramatically" since the onset of her ailments, and reports that she has suffered negative personal, emotional, and financial tolls. (R. 105). Plaintiff testified that it is hard for her to do the "basic functions of life." (*Id.*). In her functional report, plaintiff explained that she has trouble sleeping, cannot bend to put socks or shoes on, cannot stand or sit long enough to blow dry hair, needs assistance shaving legs, and does not do household chores. (R. 214-16). She wrote that when she goes shopping she utilizes a motorized scooter. (R. 220). She did note, however, that she could drive a car, supervise chores, prepare meals, and take care of her own personal hygiene. (R. 213-23). Plaintiff testified that taking public transportation hurts and is "intense," and that she takes special medical transportation to doctor's appointments. (R. 83).

She testified that as a result of her mild carpal tunnel syndrome, plaintiff occasionally drops things that she is holding. (R. 92-3). At the time of the hearing, she testified that she was currently attending physical therapy for her back, (R. 105-6), after undergoing a discogram on September 11, 2013, and a discectomy on October 8, 2013. (R. 57).

## 2. *Vocational Expert's Testimony*

Vocational Expert Esperanza J. Distefano (the "VE") testified at the hearing. (R. 93). She explained that plaintiff's most recent position as an assistant manager at Walmart aligned with the Dictionary of Occupational Titles ("DOT") code 185.167-046, and that the position entails light exertion with a vocational preparation of 7. (R. 94-5). She further testified that public relations work, which was plaintiff's job from 1991 to September of 2008, (R. 222), was codified in DOT 165.167-014, and is a sedentary position with a specific vocational preparation of 7. (R. 95).

The VE testified that a hypothetical person with claimant's age, education, work history, who can only occasionally crouch, stoop, kneel, climb, and descend stairs would be capable of work in public relations as it is done nationally. (R. 98-9). A hypothetical person with those same limitations, but who also needs to be able to stand and sit at will, is also capable of public relations work. (*Id.*). However, she testified that a person with those limitations but is either off task 20% of the work day or requires 3 or more sick days a month would not be able to maintain employment. (R. 101-2). Additionally, the VE testified that plaintiff has skills that are transferable to other sedentary work positions. (R. 97-8).

B. *Medical Evidence*

The ALJ reviewed plaintiff's medical records and the clinical assessments of plaintiff's treating and non-treating physicians. (R. 29-38).

1. *Treating Physician's Records*

The ALJ reviewed records produced by Steven Bernstein, D.P.M, a podiatrist and board certified foot and ankle surgeon who plaintiff visited multiple times between 2012 and 2013. On July 13, 2012, a day after the reported onset date, Dr. Bernstein put plaintiff on "no work status" until further notice. (R. 358). Dr. Bernstein noted on August 27, 2012 that she was "healing nicely" after surgery on her right foot, but wrote on multiple occasions from August 2012 to November 1, 2012 that she had pain, swelling, and tenderness in her Achilles tendon. (R. 359-64). Plaintiff underwent Achillies tendon repair on November 2, 2012, and on December 17, 2012 Dr. Bernstein wrote that her Achillies tendon has "healed completely." (R. 367). Dr. Bernstein noted after plaintiff visited with him three times in January 2013 that she had healed well from the Achilles tendon repair, but that she complained of pain in the hip, knees, and back. (R. 652-4).

After plaintiff was involved in a car accident on January 30, 2013, she visited Dr. Bernstein on February 4, 2013. Dr. Bernstein noted that she reported significant pain in her neck, back, and lower extremities and he agreed that she sustained multiple injuries from the accident. (R. 655). On both February 25, 2013 and March 18, 2013, he noted that plaintiff again reported pain in her leg, knee, and back, but that her Achilles tendon is doing well. (R. 658-9).

On April 17, 2013 however, Dr. Bernstein noted that her Achillies tendon repairs are "flaring up," that her tendons are slightly swollen and painful, and that she has foot pain stemming from her plantar fasciitis. (R. 661). On April 24, 2013 he wrote that while she is having discomfort with her Achillies tendon, she is for the most part "doing well for the foot and ankle issues." (R. 662). He wrote that her "no work" status should continue in light of her Achillies tendon problems. (*Id.*).

On May 29, 2013, Dr. Bernstein noted that while plaintiff's Achilles tendons have "healed," she reported that her "whole body hurts from her toes, ankles, knees, hips, and back." (R. 664). On June 12, 2013 he stated that he would fit her for orthotic devices to address her foot pain. (R. 666). On July 1, 2013, Dr. Bernstein noted that plaintiff had "significant plantar fasciitis", and that "when the time comes to possibly release to [sic] back to work I feel that only a sedentary position should be obtained." (R. 667). On July 24, 2013, Dr. Bernstein wrote that plaintiff was doing well after a knee surgery, but that she should not go back to work sitting any more than two to three hours a day. (R. 668). On September 4, 2013, he noted that plaintiff was doing well from a foot and ankle standpoint, but that she is not doing well with her lower back. (R. 1006).

On October 29, 2013, Dr. Bernstein examined plaintiff and noted that she was still having problems with her ankles and that her Achilles tendon is slightly tender, but that her major problem is the pain radiating down her back. (R. 641). On October 29, 2013, Dr. Bernstein filled out a residual functional capacity assessment, in which he reported that plaintiff is capable of standing or walking less than one hour and sitting less than two hours during an eight hour work day. (R. 639). He further noted that plaintiff takes medication that would interfere with her ability to work, that she suffers from pain that prevents her from performing 8 hours of work, that she required an average of 3 or more sick days a month, and that she would be off task for more than 10% of the work day. (R. 640).

On November 25, 2013, the ALJ wrote to Dr. Bernstein to "clarify and understand the basis" of his medical opinion and to "resolve conflicts, inconsistencies, ambiguities, or insufficiencies" in the medical records. (R. 303-307). Dr. Bernstein did not respond to this request.

The ALJ also reviewed records from David Deramo, M.D., an orthopedist who had treated the plaintiff since July 26, 2012. (R. 30). He noted after the first visit that plaintiff had normal gait and deep tendon reflexes, but that she did have right and left paraspinal tenderness of the lumbar spine, as well as mild midline tenderness. (R. 407). He tested her range of motion and her muscle strength, and determined that she had patellar chondromalacia, knee joint pain, bursitis of the hip, and lumbar sprain. (*Id.*). During that visit plaintiff reported that the pain radiating from her left knee, left hip, and lower back was a 7 out of 10 intensity, which is exacerbated through physical activity. (R. 433).

On August 16, 2012, Dr. Deramo wrote that plaintiff was not yet able to return to work due to her left knee, left hip, and lower back pain. (R. 431). On September 13, 2012, he noted that plaintiff started acupuncture for her pain, but that her physical condition was "essentially unchanged" from August. (R. 428). On December 28, 2012, Dr. Deramo administered a cortisone injection in her left knee, and again noted that she was not yet ready to return to work. (R. 937).

After plaintiff's car accident, she was examined by Dr. Deramo on February 28, 2013. His examination revealed that she was not in acute distress, that she had normal gait, and normal deep tendon reflexes. (R. 930-1). His findings were similar to those after previous examinations, and included tenderness in her back, shoulder, buttock, knees, and sciatic notch, and a positive straight leg raise test. (R. 931). He recommended that she continue chiropractic treatment, physical therapy, and medication. (*Id.*).

On March 27, 2013, Dr. Deramo examined plaintiff again and noted that her knees had not significantly improved with therapy, and that she continued to experience neck and lower back pain, as well as pain in her right and left knees. (R. 928). Physical examination showed that she had full muscle strength. (*Id.*).

After a right knee MRI on April 1, 2013 revealed a grade I MCL sprain, small joint effusion, and a tear on the posterior horn of the medial meniscus, Dr. Deramo administered a right knee cortisone injection on April 17, 2013. (R. 924). He noted that plaintiff demonstrated muscle strength of 5- out of 5, and that she was ligamentously stable. (R. 925).

On May 29, 2013, he wrote that plaintiff reported that the cortisone injection helped, but that she still had significant pain in her left knee. (R. 919). On June 14, 2013, he

wrote that plaintiff was "disabled and unable to return back to the line of work that she is currently in." (R. 690). He indicated that her diagnoses were patellar chondromalacia, knee joint pain, bursitis of the hip, lumbar sprain, and internal derangement of the knee. (R. 689).

Dr. Deramo performed a left knee diagnostic arthroscopy with a medial meniscectomy and chondroplastly on July 12, 2013. (R. 495). On July 19, 2013, he noted that plaintiff was "doing quite well," but was still unable to work because of her surgery and other injuries. On September 3, 2013, he wrote that she was making "slow and steady progress" after the surgery, but was using a cane and continued to have lower back and left leg pain. (R. 905).

Dr. Deramo filled out a residual functional capacity assessment dated October 30, 2013, in which he wrote that plaintiff could not stand or walk for more than two hours during a work day, and that she could not sit for more than four hours in a work day. (R. 901). Further, he reported that plaintiff takes medication that interferes with her ability to work, suffers from pain which prevents her from working 8 hours, and would require an average of three or more sick days per month. (R. 902).

On November 25, 2013, the ALJ wrote to Dr. Deramo to "clarify and understand the basis" of his medical opinion and to "resolve conflicts, inconsistencies, ambiguities, or insufficiencies" in the medical records. (R. 291-94). Dr. Deramo responded, explaining that his residual functional capacity report was based on his clinical examinations, his expertise in the field of orthopedics, and the plaintiff's complains of pain. (R. 1013-16). Dr. Deramo noted that he did not perform a functional capacity examination, nor did he specifically test plaintiff's ability to lift, sit, stand, or walk. (*Id.*).

Finally, on January 6, 2014, Dr. Deramo completed a medical questionnaire for Walmart, plaintiff's former employer. (R. 1007). He wrote that the patient had sciatica, lumbar strain, and left knee internal derangement. (*Id.*). He gave her a "guarded" prognosis, and wrote that plaintiff cannot lift more than 10 pounds, and cannot stand, sit, stand, or walk for more than an hour at a time. (*Id.*).

The last of the plaintiff's treating physicians whose records the ALJ reviewed was Steven Waldman, M.D., a pain management specialist. Plaintiff's first visit with Dr. Waldman was on April 10, 2013. He noted that she walked with a slightly antalgic gait, and had decreased ranges of motion and sensation in her left arm, decreased sensitivity in the lower left leg, and positive straight leg raise tests bilaterally. (R. 635-6). He reviewed an MRI's of her back and noted that she had a disc bulge at L4-5 that was significantly exacerbated by the January 30, 2013 car accident. (*Id.*)

Dr. Waldman performed a lumbar epidural steroid injection on June 5, 2013, and a cervical epidural steroid injection on June 25, 2013. (R. 628). On June 17, 2013, Dr. Waldman wrote letters stating that plaintiff did not have clearance to return to work, and should abstain until "further notice." (R. 630).

On July 1, 2013, Dr. Waldman wrote that plaintiff obtained "good relief" from the injection administered on June 25, but wrote that the 80% pain relief she experienced from the June 5 injection "unfortunately" lasted only two weeks. (R. 493).

On August 16, 2013, Dr. Waldman wrote that plaintiff now required Percocet for her pain because of its severity and its "failure to respond to conservative treatment." (R. 622). He wrote that she likely required surgical intervention, and requested authorization for a lumbar

discography. (*Id.*). Dr. Waldman performed the lumbar discography on September 11, 2013. (R. 614).

On September 26, 2013 Dr. Waldman noted that plaintiff continued to complain of severe low back and leg pain, (R. 622), and on October 8, 2013 Dr. Waldman performed an L5-S1 discectomy surgery on plaintiff. (R. 855-7).

On October 16, 2013, Dr. Waldman completed a residual functional capacity report stating that plaintiff could stand and walk for less than one hour and sit for less than two hours during an eight hour work day. (R. 610). He noted that she would require frequent breaks of 15 minutes or more, had pain that prevented her from completing eight hours of work, required medication that interfered with her ability to function in a work setting, and required three or more sick days per month. (R. 611).

Dr. Waldman noted on October 29, 2013 that plaintiff continued to complain of moderate neck pain and severe lower back pain. (R. 740). He wrote that plaintiff was temporarily disabled and that she likely would require additional surgery to deal with her back pain. (*Id.*).

On November 20, 2013, Dr. Waldman again noted that plaintiff complained of severe lower back pain, and that she likely required a microdiscectomy and possibly lumbosacral fusion. (R. 881). He recommended that she go to the emergency room to get an MRI, which showed disc disease at L1-2, L4-5, and L5-S1. (R. 884-85).

On November 25, 2013, the ALJ wrote to Dr. Waldman to "clarify and understand the basis" of his medical opinion and to "resolve conflicts, inconsistencies,

ambiguities, or insufficiencies" in the medical records. (R. 297-301). Dr. Waldman failed to responded to this request. (R. 38).

On January 6, 2014, Dr. Waldman completed a medical questionnaire for Walmart, in which he stated that plaintiff's prognosis was "fair," that she should not do any heavy lifting, that her ability to bend, stand, walk, and lift were affected, and that these limitations were expected to last for three months. (R. 1008).

2. *Independent Medical Examiners' Records*

Plaintiff was examined by numerous consultative examiners at the request of SSA and the Worker's Compensation Board.

George Burak, M.D., examined plaintiff on March 28, 2012. (R. 843). He noted that she complained of pain in her feet and ankles, and wrote that plaintiff had a chronic history of right and left Achilles tendon problems. (R. 845). He wrote that the Achilles tendon surgery she underwent in December 2011 was progressing well, and that in two weeks she would be able to return to her previous occupation without any restrictions. (R. 845). He stated that she had a mild partial disability of her right ankle, but no disruptions in her left ankle. (R. 845-46).

He examined her again on October 17, 2012 – after she stopped working but before the car accident in early 2013. (R. 851). He found that plaintiff had a normal range of motion and full strength in both ankles. (*Id.*). He wrote that she could return to her work at Walmart if she avoided excessive walking and climbing. (R. 852).

William Lathan, M.D., examined plaintiff on November 5, 2012. (R. 387). He noted that plaintiff used crutches during the exam, but that she needed no help changing, getting on and off the examination table, or rising from her chair. (R. 388). He noted that plaintiff did

13

not appear to be in acute distress, and that she had a moderate restriction for bending, lifting, pushing, pulling, squatting, standing, walking, and strenuous exertion. (R. 390).

Ronald Mann, M.D., an orthopedic surgeon, examined plaintiff on May 29, 2013. (R. 564). He wrote that she complained of pain in her neck, back, shoulders, knees, and ankles, but observed that she had no limp or antalgic gait, sat comfortably, and moved her neck, head and body freely during their conversation. (R. 556). He wrote that plaintiff had a mild orthopedic disability, but that she was capable working as she was prior to the car accident. (R. 569).

Frank Moore, M.D., examined plaintiff on September 4, 2013 for a neurological consultation. (R. 605). He noted that she has "evidence of progressively worsening mechanical low back pain" despite injections, physical therapy and acupuncture. (*Id.*).

John Cifelli, M.D., examined plaintiff on September 5, 2013 for a neurological consultation. He found that she had diminished sensation to pinprick and light touch over her entire left hand, left lateral forearm, left lateral lower leg, and entire left foot. (R. 608).

Julio Westerband, M.D., an orthopedic surgeon, examined plaintiff on September 20, 2013. He observed that plaintiff sat comfortably, moved her head, neck, and body freely during their conversation, and was able to get on the examining table without assistance. (R. 866). He used a goniometer, an objective device to measure ranges of motion. (*Id.*). He determined that her left knee had a limited range of motion, that her right knee had diminished range of motion, and that her ankles had normal ranges of motion. (R. 866-8). He wrote that plaintiff had a mild orthopedic disability and was capable of working with restrictions of no

heavy lifting over 15 pounds, and that she was could perform activities of daily living as she was before the accident.  (R. 871-2).

Paul Jones, M.D., an orthopedic surgeon, examined plaintiff on October 31, 2013. (R. 874).  He noted that plaintiff was a "rather poor historian," and that he was unable to determine from their discussion when plaintiff developed knee and lower back pain.  (R. 876). He performed a physical examination of plaintiff and also utilized a goniometer, but noted that her participation in the testing was done "in a very perfunctory manner without a genuine effort put forth."  (*Id.*).  He wrote that while plaintiff had a "marked disability," plaintiff was capable of doing sedentary part time work.  (*Id.*).

Jerome Moga, M.D., examined plaintiff on September 12, 2014, (R. 1056), and while these records were not considered in the ALJ's September 4, 2014 decision, they were submitted to the Appeal Council for consideration before Commissioner made a final determination.  (R. 323-6).  Dr. Moga found that plaintiff had tenderness, crepitus, numbness, radiating pain, and that she was capable of "less than sedentary work."  (R. 1059).  He also noted that plaintiff could not lift more than 5 pounds.  (R. 1059).

3.  *Chiropractors' Records*

Andrew Strauss, a chiropractor, was neither an independent medical examiner, nor a treating physician of plaintiff.  (R. 572).  On May 17, 2013, he wrote that plaintiff reported that she was experiencing a 7 out of 10 pain her neck, upper back, mid back, and lower back.  (R. 572-3).  He found that she had decreased lumbar range and tenderness, severe muscle weakness in her hamstrings, and moderate rigidity in her lower back.  (R. 573).  He found that plaintiff had positive Ely's Sign bilaterally, positive Lasegue Test bilaterally, and positive straight leg test

bilaterally. (*Id.*). He noted that plaintiff reported to him that she walks and swims in her free time. (R. 573). After an examination of the plaintiff on July 5, 2013, Mr. Strauss wrote that plaintiff was considered to have a severe disability of her neck and a severe disability of her lower back. (R. 582).

Pamela Baltas, a chiropractor, examined plaintiff on May 29, 2013. (R. 558). She noted that plaintiff appeared to have normal gait, posture, and appearance. (R. 560). She found that plaintiff had largely normal ranges of motion, but that she complained of pain. (R. 561). Ms. Baltas wrote that plaintiff was capable of performing activities of daily living as she was prior to the accident, with a restriction of no heavy lifting over 15 pounds. (R. 562).

III.    APPLICABLE LAW

A. *Standard of Review*

Under Rule 12(c), Fed. R. Civ. P., a movant is entitled to judgment on the pleadings only if he establishes that, based on the pleadings, he is entitled to judgment as a matter of law. *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537*, 47 F.3d 14, 16 (2d Cir. 1995). "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

District court review of the Commissioner's final decision denying disability benefits is limited. A court may not review the Commissioner's decision *de novo*. *See Cage v. Comm'r of Soc. Servs.*, 692 F.3d 118, 122 (2d Cir. 2012) (citation omitted). If the Commissioner's findings are free of legal error and supported by substantial evidence, then the

court must uphold the decision.  42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, and where a claim has been denied . . . the court shall review only the question of conformity with [the] regulations . . . "); *see also Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).

A court's review thus involved two levels of inquiry.  *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).  First, the court must review "whether the Commissioner applied the correct legal standard," *id.,* including adherence to applicable regulations, *see Kohler*, 546 F.3d at 265.  Second, the court must decide whether the Commissioner's decision is supported by substantial evidence.  *Tejada*, 167 F.3d at 773.

An ALJ's "[f]ailure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  An ALJ's factual findings supported by substantial evidence are "binding" on a district court; however, "where an error of law has been made that might have affected the disposition of the case," the court cannot simply defer to the ALJ's factual findings.  *Id.*

In a social security case, the phrase "substantial evidence" "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is "a very deferential standard of review – even more so than the 'clearly erroneous' standard."  *Brault v. Comm'r of Social Sec.*, 683 F.3d 443, 448 (2d Cir. 2012).  "[G]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citation omitted).  In particular, a court must show special deference to an ALJ's credibility determinations because the ALJ had the

opportunity to observe the witnesses' demeanor while testifying. *Yellow Freight Sys. Inc. v. Reich*, 38 F.3d 76, 81 (2d Cir 1994); *see also Snell v. Apfel*, 177 F.3d 128, 135 (2d. Cir. 1999).

B. *Five-Step Disability Determination*

The Act defines "disability" in relevant part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act provides that "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). "[W]ork which exists in the national economy" "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A); *see also* 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner's determination of a claimant's disability follows a five-step sequential analysis promulgated by the SSA. 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described this analysis as follows:

> First, the [Commissioner] considered whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] considered whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him

disabled without considering vocational factors such as age, education and work experience . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (brackets and omissions in original)). The claimant bears the burden of proof for the first four steps; the burden shifts to the Commissioner at the fifth step. *See Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000).

"In making his determination by this process, the Commissioner must consider four factors: (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's education background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam) (citation and quotation marks omitted). Further, the Commissioner "shall consider the combined effects of all the individual's impairments . . . " 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

C. *Treating Physician Rule*

Under applicable regulations, the opinion of a claimant's treating physician regarding "the nature and severity of [claimant's] impairment[s]" will be given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess*, 537 F.3d at 128 (citations omitted).

In contrast, a treating physician's opinion is not given controlling weight when the opinion is inconsistent with other substantial evidence in the record, such as the opinion of

other medical experts.  20 C.F.R. § 404.1527(d)(2); *Snell*, 177 F.3d at 133.  In such a case, a report from a consultative physician may constitute substantial evidence.  *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983).  If the ALJ gives the treating physician's opinion less than controlling weight, he must provide good reasons for doing so.  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

If not afforded controlling weight, a treating physician's opinion is given weight according to a number of factors, including, *inter alia*, (i) the frequency of examinations and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the physician's opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the physician has a relevant specialty.  20 C.F.R. §§ 404.1527(c), 416.927(c)(2); *see Clark*, 143 F.3d at 118.

The opinion of a treating physician, or any doctor, that the claimant is "disabled" or "unable to work" is not controlling.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).  Medical opinions on such issues are merely a consideration and not determinative.  20 C.F.R. § 404.1527(e).  Such issues are reserved to the Commissioner.  *Id.* Reserving these issues to the Commissioner relieves the SSA of having to credit a doctor's finding regarding these issues, but that "does not exempt [the ALJ] from [his] obligation . . . to explain why a treating physician's opinions are not being credited."  *Snell*, 177 F.3d at 134.

IV.     DISCUSSION

A. *The ALJ's Decision*

Applying the five-step process for evaluating disability claims, *see* 20 C.F.R. §§ 404.1520, 416.920; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999), the ALJ denied plaintiff's benefit claim.  (R. 22-40).  First, the ALJ determined that plaintiff had not engaged in substantial employment since July 12, 2012, the alleged onset date of impairment.  (R. 27).

At step two, he found that plaintiff has several impairments, as defined in 20 C.F.R. § 404.1520(c), which impose "significant limitations on the claimant's ability to perform basic work activities," and found that they are expected to last for a continuous period of 12 months.  *Id.*; *see also* 20 C.F.R. §§ 404.1513(a), 404.1521, 404.1509.

At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 27).  Specially, the ALJ concluded that the record did not establish that plaintiff suffered from the impairments of Listing 1.02 (Major Dysfunction of a Joint), 1.03 (Reconstructive Surgery or Surgical Arthrodesis of a Major Weight-Bearing Joint), or 1.04 (Disorders of the Spine). (R. 28).  The ALJ noted at this step that he, in accordance with S.S.R. 02-1p, considered plaintiff's obesity throughout the sequential disability assessment.  (*Id.*)

At step four, the ALJ found that plaintiff had the residual functional capacity to perform sedentary work, like her past work as a public relations representative.  (R. 28, 39); *see also* 20 C.F.R. § 404.1529.  The ALJ determined that her ability to perform sedentary work is limited by her need to "ambulate with a cane . . . frequently flex, extend, and rotate the neck;

frequently finger bilaterally; and she needs to be able to sit and stand at will." (*Id.*) He wrote that she has the capacity to occasionally stoop, crouch, kneel, and climb and descend stairs. (*Id.*). The ALJ's analysis under the five-step sequential framework completed at step four with this finding, and he did not proceed to step five.

The ALJ also decided that plaintiff's allegations of debilitating symptoms were not wholly credible. (R. 38). In making this determination, the ALJ considered the factors described in 20 C.F.R. § 404.1529(c)(3) and S.S.R. 96-7p, and specifically pointed to plaintiff's function report and medical records to support his conclusion. (R. 38-9).

B. *Weight Afforded to Treating Physicians' Opinions*

The ALJ declined to give controlling weight to the opinions of plaintiff's physicians, Dr. Deramo, the orthopedist, Dr. Bernstein, the podiatrist, and Dr. Waldman, the pain management specialist. (R. 37-8). The ALJ concluded that Dr. Deramo's opinion should be given little weight because it was in "sharp contrast" to the independent medical examinations ("IMEs") and the clinical findings therein, and because it was inconsistent with his own treatment records. (R. 37). The ALJ gave Dr. Bernstein's opinion little weight because it conflicted with the findings of Dr. Burak, and because of inconsistencies between Dr. Bernstein's own treatment notes and opinion. (*Id.*). The ALJ gave Dr. Waldman's opinion little weight because his assessment was "not well supported by the IMEs in the record." (R. 38).

Instead, the ALJ gave "great weight" to the opinions of independent medical examiners Dr. Burak, Dr. Mann, and Dr. Westerband. (R. 34-6). He gave Dr. Burak's opinion regarding plaintiff's Achilles tendon great weight because it is based on his examination of her and is "well supported by clinical findings." (R. 34). He gave Dr. Mann's opinion great weight

22

because of his expertise in orthopedics, and because he "based his assessment on clinical findings." (R. 35). Finally, he gave Dr. Westerband's opinion great weight because of his expertise in orthopedic surgery, his having examined the plaintiff, and because he "reviewed treating source reports and examinations, as well as MRIs and EMGs in reaching his determination." (R. 36).

The ALJ did not err in refusing to afford plaintiff's treating physicians controlling weight, since their opinions that plaintiff could not perform sedentary work conflicted with the opinions of the independent medical examiners. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("The opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts) (citations omitted).

Having not afforded a treating physician's opinion controlling weight, the ALJ was obligated to "comprehensively set forth the reasons for the weight" ultimately assigned to the treating source. *Id.* at 33. An ALJ must assess a treating physician's opinion in accordance with the factors set forth in the regulations, and must also provide "good reasons" supporting their weight assignment. Failure to do so constitutes ground for reversal and remand. *See Ellington v. Astrue*, 641 F.Supp. 2d. 322, 330-1 (S.D.N.Y. 2009) ("the ALJ committed legal error in not describing how much weight he did accord to [the treating physician's] opinion once he determined that it was not controlling"); *Halloran*, 362 F.3d at 33 ("we do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion"); *Avila v. Astrue*, 933 F.Supp. 2d. 640, 653 (S.D.N.Y. 2013) (explaining that an ALJ must consider the regulation factors in order to override a treating physician's opinion); 20 C.F.R. § 404.1527(c). "Good reasons" are those which assist in judicial review of

cases as well as allow claimants to better understand the outcome of their cases. *Oomen v. Berryhill*, No. 16 cv 335 (JLC), 2017 WL 1386355, at *7 (S.D.N.Y. Apr. 17, 2017) (citing *Halloran,* 362 F.3d at 33).

Plaintiff argues that the ALJ "improperly applied the treating physician's rule" by giving little weight to Dr. Deramo, Dr. Bernstein, and Dr. Waldman, and great weight to Dr. Burak, Dr. Mann, and Dr. Westerband. (Pl. Mem. 14-15.). As will be developed, the ALJ's application of the treating physical rule and ultimate weight assignment to the opinions of Dr. Deramo, Dr. Bernstein, and Dr. Waldman was free from legal error and supported by substantial evidence.

1. *Dr. Deramo*

As described above Dr. Deramo provided opinions in October 2013 and January 2014 containing limitations that would preclude plaintiff's performance of even sedentary work. (R. 673, 674, 1007). The ALJ gave these opinions little weight. (R. 27).

In his decision, the ALJ noted and considered the required factors including Dr. Deramo's specialization, the examining relationship, the length and frequency of the treatment, and the nature and extent of the treatment relationship. 20 C.F.R. §§ 404.1527(c)(1), (2), (5). He noted Dr. Deramo's expertise in orthopedics, (R. 37), stated that Dr. Deramo had treated plaintiff since July 2012, (R. 30), and discussed treatment notes that spanned the length of the treating relationship from July 2012 through December 2013, a year and five months. (R. 30-31).

The ALJ also considered the consistency and supportability of Dr. Deramo's opinions. 20 C.F.R. §§ 404.1527(3), (4). For example, the ALJ noted that while Dr. Deramo

wrote that plaintiff could lift less than 5 pounds in his October 2013 opinions, he stated in

January 2014 that she could lift up to 10 pounds.  (R. 37).  Furthermore, the ALJ wrote that Dr.

Deramo repeatedly found that plaintiff's gait was normal, that she had multiple negative straight

leg raise tests, that the strength in her lower extremities was only mildly diminished, and that she

was ligamentous stable.  (R. 30-31).  The ALJ also wrote that independent medical examinations

did not support Dr. Deramo's opinions.  (R. 37).  He noted that Dr. Deramo's conclusions were

inconsistent with Dr. Mann's observations and clinical examination results, and specifically

pointed to Dr. Mann's observations on May 29, 2013 that plaintiff had normal gait, sat

comfortably, and moved her neck, head, and body freely.  (R. 35, *referring to* R. 556).

Additionally, the ALJ considered that Dr. Deramo's conclusions contrasted with Dr.

Westerband's clinical observations.  (R. 35, 37).  Specifically, Dr. Westerband's observations

that plaintiff moved freely during their discussion, was able to get on the examination table

without assistance, and was capable of lifting up to 15 pounds, cannot be reconciled with Dr.

Deramo's conclusions.  (R. 866).  In resolving these inconsistencies, the ALJ chose to assign

significant weight to Dr. Westerband and Dr. Mann's opinions, and little weight to Dr. Deramo's

opinion.  (R. 34-37).

It is not a legal error *per* se to assign greater weight to a non-treating physician

than a treating physician, *see Rosier v. Clovin*, 586 F.App'x 756, 758 (2d Cir. 2014) (summary

order); S.S.R. No. 96-6p, 1996 WL 374180, at *3.  However, the SSA regulations reflect a

general preference for assigning greater weight to treating physicians.  *See* 20 C.F.R. §

404.1527(c)(2) ("[treating sources] may bring a unique perspective to the medical evidence that

cannot be obtained from the objective medical findings alone or from reports of individual

examinations").

An ALJ's weight assignment is in accordance with the treating physician rule if the record supports the ALJ's determinations. 20 C.F.R. § 416.927(e); *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided that they are supported by evidence in the record"); *Aarons v. Colvin*, No. 14 cv 04343 (PKC), 2015 WL 5000843, at *13 (S.D.N.Y. Aug. 21, 2015), *appeal dismissed* (May 11, 2016) (an ALJ's can give little weight to a treating physician's opinion and great weight to a consultative examiner when supported by medical evidence in the record).

An ALJ may not set his own expertise against that of a physician who submitted medical opinions to him, but he may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). In fact, it is the role of the ALJ to reconcile conflicting medical evidence. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). The ALJ's weight assignment decision was presented after a meticulous review of Dr. Deramo's treatment notes. The ALJ provided a sufficient explanation of how Dr. Deramo's notes were inconsistent with his conclusory determination that plaintiff could not work. Furthermore, the decision to assign little weight to Dr. Deramo's opinion was supported by substantial evidence in the record, including the IMEs. *See Mongeur*, 722 F.2d at 1039 (an IME report based on objective medical evidence that contradicts a treating physician's opinion can be substantial evidence).

The ALJ's decision to give Dr. Deramo's opinion little weight was supported by substantial evidence, and is free from legal error because it was justified with good reasons after a consideration of the factors listed in 20 C.F.R. § 404.1527(c).

2. *Dr. Bernstein*

Dr. Bernstein opined that plaintiff's abilities in a work setting would be severely limited. (R. 639-40). The ALJ gave this opinion little weight. (R. 37).

In making this determination, the ALJ noted Dr. Bernstein's specialization as a podiatrist, (R. 29), the examining relationship between him and plaintiff, and the length and frequency of the treatment. (R. 29-30); 20 C.F.R. §§ 404.1527(c)(2), (5). The ALJ also considered the consistency and supportability of Dr. Bernstein's opinions. 20 C.F.R. §§ 404.1527(3), (4).

The ALJ properly determined that Dr. Bernstein's own medical treatment records and notes contradict his ultimate assessment of plaintiff's ability to work. (R. 37). It is true that Dr. Bernstein put plaintiff on "no work status" on July 13, 2012 because of a "work related accident." (R. 358). However, his subsequent treatment notes feature multiple instances of Dr. Bernstein writing positively of plaintiff's progress, and of the status of her feet and ankles, his area of expertise. For example, after plaintiff had surgery to partially repair an Achilles tendon in early November 2012, Dr. Bernstein reported by the end of the month that plaintiff was "doing well with the left ankle status post-surgery." (R. 366). Three weeks later he noted that "the left Achilles tendon is healed completely." (R. 367). In January 2013 Dr. Bernstein noted that plaintiff had "done quite well", exhibited "[m]inimal to no swelling and minimal pain," and that while she had "some pain" in her heels, hip, knee, and back, her surgery wounds were "well healed." (R. 653).

Plaintiff was examined by Dr. Bernstein after the car she was driving was struck in the rear on January 30, 2013. At that point Dr. Bernstein referred her to Dr. Deramo, noted

that he would treat her conservatively with anti-inflammatories and therapy, and gave her a prescription blank with the names and telephone numbers of two attorneys. (R. 655-56). On April 1, 2013, Dr. Bernstein wrote that plaintiff was "quite happy that she is now recognized Workers' Compensation related," and on that day made no observations concerning plaintiff's feet or ankles, but noted that she was experiencing back pain. (R. 660). Two weeks later Dr. Bernstein wrote that plaintiff came to him with a "significant list of questions" about "Workers' Compensation and motor vehicle cases." (R. 661). On April 24, 2013, Dr. Bernstein noted that plaintiff was experiencing discomfort with her Achilles tendon, but that "for the most part she is doing well for the foot and ankle issues." (R. 662). Despite this assessment, Dr. Bernstein wrote that he would "continue her on no work status at Walmart," and that she could not return to work "anytime soon" because of the Achilles tendon and knee problem. (*Id.*). On May 29, 2013, Dr. Bernstein noted that plaintiff came in "to discuss Workers' Compensation injuries," and that plaintiff's Achilles tendons, while slightly swollen and tight, had healed. (R. 664). On June 12, 2013, he noted that plaintiff was experiencing pain from plantar fasciitis, but that the "Achilles tendons are doing well." (R. 666).

The ALJ properly determined that Dr. Bernstein's clinical observations including his largely positive assessments of plaintiff's foot and ankle health do not support his conclusory determination that plaintiff's ability to work is dramatically limited.

The ALJ also noted that Dr. Bernstein's opinion conflicted with the IME from Dr. Burak. (R. 37). Dr. Burak, who examined plaintiff's feet as an orthopedic specialist, found in October of 2012 that plaintiff had a full range of motion and full strength in both ankles, and in March of 2012 found that she had a mild partial disability of her right ankle, but no disruptions in her left ankle. (R. 845-6, 852).

Throughout Dr. Bernstein's records are references to plaintiff's neck, back, knee, and shoulder pain. (*see, e.g.,* R. 37, 658, 661). The regulations instruct the ALJ to take a treating physician's area of specialization into account when determining how heavily to weigh their opinion. 20 C.F.R. § 404.1527(c)(1). As was already developed, Dr. Bernstein's treatment noted pertaining to plaintiff's feet and ankles, his area of expertise as a podiatrist, do not support his ultimate conclusion. Dr. Bernstein's conclusion that plaintiff's abilities were drastically limited was likely motivated by his assessment of her neck, back, knee, and shoulder pain, all areas outside of his expertise. However, the ALJ already determined that the opinions of Dr. Westerband, Dr. Mann, and Dr. Burak regarding plaintiff's orthopedic condition should be afforded great weight. The ALJ properly concluded that the opinions of those orthopedic specialists regarding the extent and effects of plaintiff's neck, back, knee and should pain, should outweigh that of Dr. Bernstein as a podiatrist.

The Court notes that one of the reasons given by the ALJ to support weight attribution to Dr. Bernstein is not persuasive. The ALJ wrote that Dr. Bernstein's July 1, 2013 assessment, which the ALJ characterized as an "indicat[ion] that he felt a sedentary job should be obtained," was inconsistent with his ultimate opinion. (R. 37, *referring to* R. 667). This characterization of Dr. Bernstein's July 1, 2013 assessment is not wholly accurate. As noted earlier, Dr. Bernstein's actually wrote that "when the time comes to *possibly* release to [sic] back to work I feel that *only* a sedentary position should be obtained". (R. 667) (emphasis added). It is likely then that Dr. Bernstein meant that at some future point when plaintiff would be healthy enough to work, her physical capabilities in a work setting would be limited. Properly understood, Dr. Bernstein's July 1, 2013 assessment does not directly contradict his October 29, 2013 opinion indicating that plaintiff's current work ability is severely limited. (R. 639). This

therefore cannot constitute a "good reason" justifying the ALJ's weight assignment determination. *See Wilson v. Colvin*, 213 F.Supp. 3d 478, 483 (W.D.N.Y. 2016) (citing *Lowe v. Colvin*, No. 6:15 cv 6077 (MAT), 2016 WL 624922, at *5 (W.D.N.Y. Feb. 17, 2016)) ("[a] reason . . . that relies on a mischaracterization of the record cannot be a 'good reason'"). However, the ALJ's inclusion of this additional reason does not undermine the ALJ's ultimate conclusion because he provided other compelling, wholly substantiated reasons that support his weight attribution to Dr. Bernstein's opinion.

The ALJ's decision to give Dr. Bernstein's opinion little weight was supported by substantial evidence, and is free from legal error because it was justified with good reasons after a consideration of the factors listed in 20 C.F.R. § 404.1527(c).

### 3. *Dr. Waldman*

Finally, the ALJ assigned little weight to Dr. Waldman's opinion. (R. 38). In doing so he properly considered the factors outlined in the regulations. The ALJ noted that Dr. Waldman was a pain management specialist, acknowledged the examining relationship between Dr. Waldman and plaintiff, and described the frequency with which plaintiff visited him. (R. 32-33, 36, 38); 20 C.F.R. § 404.1527(c)(1), (2), (5).

The ALJ also addressed the supportability of Dr. Waldman's opinion, and noted that it was "not well supported by the various IMEs in the record." (R. 38); 20 C.F.R. § 404.1527(c)(3). A comparison of Dr. Waldman and Dr. Westerband's clinical observations and prognoses in particular reveals a wide gap between their respective understandings of plaintiff's health status. For example, on October 29, 2013, Dr. Waldman wrote that plaintiff "is currently temporarily disabled," and that if she did not undergo an additional back surgery she would not

be able to return to gainful employment. (R. 741). Just a month earlier, however, Dr. Westerband examined plaintiff after having reviewed a considerable number of her medical records, including those of Dr. Waldman. In his September 20, 2013, assessment Dr. Westerband found that plaintiff was suffering from only a "mild orthopedic disability." He opined that plaintiff could lift up to 15 pounds, and had the capacity to work. (R. 871-72). This opinion aligned with that of Dr. Mann, who on May 29, 2013, found that while plaintiff had a mild orthopedic disability, she had the capacity to work a sedentary job. (R. 569).

The ALJ already provided a fully justified explanation for affording great weight to the opinions of Dr. Westerband and Dr. Mann in his discussion of Dr. Deramo's opinion. Dr. Westerband and Dr. Mann both examined and observed plaintiff's knees, neck, and back, and determined that her orthopedic conditions did not dramatically constrain her ability to work a sedentary job. Dr. Waldman's opinion regarding plaintiff's ability to work, as a pain management specialist, was undermined by the clinical observations and assessments of those orthopedic specialists, to which the ALJ properly afforded greater deference.

Furthermore, while the opinions of Dr. Mann and Dr. Westerband do not accord with that of Dr. Waldman in October 2013, they are consistent Dr. Waldman's later opinion from January 2014. In the medical questionnaire that Dr. Waldman filled out on January 6, 2014, Dr. Waldman indicated that plaintiff's prognosis was "fair." Rather than marking that plaintiff's impairment was "[c]hronic," Dr. Waldman indicated that the expected duration of plaintiff's limitations was 3 months. Under the section of the questionnaire labeled "[p]lease check the appropriate box for each major life activity affected," Dr. Waldman checked numerous activities including bending, lifting, and walking. Notably, however, he did not check the box next to "[w]orking." (R. 1008). This questionnaire both corroborates the opinions of Dr. Mann and Dr.

Westerband, and gives the ALJ further reason to assign reduced weight to the conclusory determinations made by Dr. Waldman on October 8 and 16, 2013.  20 C.F.R. § 404.1527(c)(3).

In the ALJ's credibility assessment of plaintiff, he briefly pointed to Dr. Waldman's note that plaintiff experienced 80 percent relief after her cervical epidural steroid injections as evidence that plaintiff's reports of pain were not fully credible.  (R. 38).  The Court acknowledges that this is not a "good reason" to justify the ALJ's weight assignment decision because it is not a wholly accurate characterization of Dr. Waldman's medical records.  In the treatment notes that the ALJ was referencing, Dr. Waldman wrote that "[u]nfortunately, [plaintiff] received only two weeks relief from the lumbar epidural achieving 80% relief for over two weeks from the lumbar epidural on June 5, 2013."  (R. 493).  Such a mischaracterization of Dr. Waldman's treatment notes is not a good reason to justify a minimized weight assessment of his opinion as a treating physician.  *Wilson*, 213 F.Supp. 3d at 483.  However, the ALJ's inclusion of this reason does not undermine other compelling reasons he proffered, which were supported by evidence in the record and in accordance with the regulations.

Dr. Waldman's opinion conflicted with the opinions of Dr. Westerband and Dr. Mann, who unlike Dr. Waldman are specialists in the field of orthopedics, and with his own treatment notes.  The ALJ's determination that his opinion should be afforded little weight was therefore supported by substantial evidence and free from legal error.

C.  *Development of the Record*

Due to the "non-adversarial nature" of Social Security proceedings, an ALJ has an affirmative obligation to develop the record "to reflect the claimant's medical history for at least a twelve-month period" in order to provide a fair and complete hearing.  *Clark v. Comm'r of Soc.*

*Sec.*, No 15 cv 8406 (PKC) (SN), 2017 WL 1162204, at *3 (S.D.N.Y. Mar. 27, 2017) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)).

"If a physician's finding in a report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician" before discrediting the opinion. *Calzada v. Astrue*, 753 F.Supp. 2d 250, 269 (S.D.N.Y. 2010); *see also Rosa*, 168 F.3d at 79. Where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel. *Perez*, 77 F.3d at 47.

However, in a case in which there "are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,'" the ALJ is not under any obligation to further develop the record. *Id.* at 48. The "mere fact that medical evidence is conflicting or internally inconsistent does not mean that an ALJ is required to re-contact a treating physician" if the record is sufficiently robust and detailed. *Micheli v. Astrue*, 501 F.App'x 26, 29-30 (2d Cir. 2012) (summary order) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("We are therefore presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict))*; see also Ellington*, 641 F.Supp. 2d at 333 ("the Court will not impose a requirement that the ALJ question a doctor for the sole purpose of explaining a medical opinion that is already accompanied by medical findings").

Plaintiff argues that the ALJ committed a legal error because he failed to reach out to Dr. Bernstein to clarify his opinion, as he did with Dr. Deramo and Dr. Waldman. (Pl.Mem. 20). Furthermore, plaintiff argues that the IME doctors to which the ALJ gave great

weight should have been sent the same questionnaire that was sent to Dr. Deramo and Dr. Waldman.  (*Id.*).

Plaintiff's first argument holds no weight as is directly contradicted by the record, which shows that the ALJ sent a letter to Dr. Bernstein in an attempt to clarify his opinion on November 25, 2013.  (R. 303-307).  It appears that Dr. Bernstein, like Dr. Waldman, failed to reply to that letter.

Plaintiff cites no authority to support the proposition that an ALJ is under an obligation to contact consultative physicians for clarification if their opinions are inconsistent with those of a treating physician.  (Pl.Mem. 20).  Notably, this is not a case in which important medical findings are missing from the records.  *See Ellington*, 641 F.Supp. 2d at 333; *cf. Rosa*, 168 F.3d at 79 (explaining that hospital records and notes were missing); *Pratts v. Chater*, 94 F.3d 34, 37 (2d. Cir 1996) (concluding that records were missing and illegible).

The record contained nearly 1,000 pages of medical records consisting of notes, test results, post-surgery reports, and medical imaging, which the ALJ reviewed and referenced with specificity throughout his opinion.  In light of this complete record, the ALJ was under no further obligation to develop the record and contact the independent examiners.  *Rosa*, 168 F.3d at 79 n.5 (explaining that where an ALJ possesses a complete medical history, they do not need do further develop the record); *Tankisi v. Comm'r of Soc. Sec.*, 521 F.App'x 29, 34 (2d. Cir 2013) (summary order) (concluding that remand is inappropriate where the ALJ can adequately assess the petitioner's residual functional capacity based on a "voluminous" record).

D. *Credibility*

The ALJ decided that plaintiff's allegations of debilitating symptoms were not wholly credible. (R. 38). Plaintiff asserts that the ALJ's assessment was erroneous. (Pl.Mem. 25-6). This Court accepts the ALJ's credibility assessment because it is supported by substantial evidence in the record and is free from legal error.

S.S.R 96-7p lists certain factors to be applied when determining the credibility of an individual's descriptions of symptoms of a physical impairment. *See* 1996 WL 374186 at *1-2. It requires an applicant's testimony concerning symptoms to be weighed in the context of medically determinable evidence, as well as the entire case record. *Id.* "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at *2. "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." *Id.* at *4.

The ALJ, not the reviewing court, has the responsibility to determine the credibility of witnesses. Courts "must show special deference" to "explicit credibility findings". *Yellow Fright Sys.*, 38 F.3d at 81; *see also Snell*, 177 F.3d at 135 ("After all, the ALJ is in a better positing to decide issues of credibility").

An ALJ need not accept subjective claims of pain as true, and may independently assess the credibility of those claims in light of medical findings and other evidence. *See Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). A determination by an ALJ that subjective claims of pain are not wholly credible must be supported by substantial evidence. *Calabrese v. Astrue*,

358 F.App'x 274, 277 (2d Cir. 2009) (summary order) (citing *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).

In the instant case, the ALJ justified his credibility assessment by pointing to: (1) the IME records which report that plaintiff is able to engage in activities of daily living; (2) other treatment records that indicate that plaintiff's surgeries and injections appeared to have reached their intended results; (3) plaintiff's treatment records that fail to show completely debilitating signs and symptoms; (4) plaintiff's own function report in which she indicates that she can drive, care for her personal hygiene, and engage in other activities with the help of her son and husband. (*Id.*).

As noted in the earlier discussion about the ALJ's weight assignment to Dr. Deramo's opinion, the conclusion that plaintiff does not suffer from entirely debilitating pain is supported by substantial evidence in the medical records. Furthermore, the ALJ's reasoning put forth to support his credibility assessment accords with the factors needed to be considered by the regulations.

Plaintiff asserts that the ALJ made a legal error by not considering her reports of pain in light of the "special technique" factors outlined in *Kohler v. Astrue*, 546 F.3d 260 (2d Cir. 2008) and 20 C.F.R. § 404.1520a(e)(2). (Pl.Mem. 22-23). This assertion is without merit as these factors need only be considered when assessing the credibility of mental impairments, and do not apply to subjective pain reports. *Kohler*, 546 F.3d at 261; § 404.1520a ("when we evaluate the severity of *mental impairments* for adults . . . we must follow a special technique") (emphasis added).

The ALJ was best-positioned "to appraise the credibility" of plaintiff, and he made "explicit credibility findings" that were consistent with evidence in the record. *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d. Cir 1983); *Yellow Freight Sys.*, 38 F.3d at 81. The Court therefore concludes that the ALJ correctly applied the law as to his findings of witness credibility and defers to the ALJ's conclusions as a factfinder on his credibility determinations.

V.     CONCLUSION

The ALJ's determination that the plaintiff was not disabled within the meaning of the Act is free from legal error and supported by substantial evidence. These conclusions are based on a sufficiently developed record. Plaintiff's motion for judgment on the pleadings (Dkt. 10) is DENIED and defendant's Cross-Motion (Dkt. 14) is GRANTED. The Clerk shall enter judgement in favor of the defendant.


SO ORDERED.


P. Kevin Castel
United States District Judge

Dated: New York, New York
       August 3, 2017